Consolidated case numbers 18-2268, 18-2269, 18-2323, 18-2324, 18-2342, 18-2364, 18-2365, 18-2401, 18-2407, 18-2408, 18-2410, 19-1028, and 19-1029. United States of America v. Michael Rich et al. 60 minutes to be shared by the defendants, 60 minutes for the plaintiffs. Ms. Masseroni, you may proceed for the appellants. Good morning. Good morning, your honors. My name is Patricia Masseroni and I represent Paul Dara in this case. I have reserved two minutes of rebuttal time. Very well. Paul Dara was subjected to an illegal wiretap from March of 2008 through October of 2008. Title III mandates not just probable cause, but it also mandates that the government show necessity and the necessity requirement is probably the most important of the two. The purpose of the necessity requirement is to ensure that a wiretap is not resorted to in situations where traditional investigative techniques would suffice to expose the crime. And in this case, A.C. Fleming and the other agents from the FBI and the DEA had multiple traditional investigative techniques that were working throughout the course of this investigation. In 2004, they had a confidential informant come forward who was a current past member of the Devil's Disciples organization who had full access to all of the church meetings and the state tribes and the clubhouses as well as the leadership people in the organization. He obtained thousands, tens of thousands of dollars for the amount and quality of information that he gave to the government beginning in 2004 and going until this indictment was made. They also had another confidential informant. And in the hierarchy of witnesses, the confidential informants are at the top level of the group based on their reliability and trustworthiness with law enforcement. Confidential informant number two who appeared in one of the affidavits who gave them extremely important information about an ongoing meth distribution ring that was going on in St. Clark County and allegedly tied with the Devil's Disciples. They had four cooperating witnesses, three of whom were current past full members of the Devil's Disciples organization. Cooperating witness number two, who turned out to be John Pizzuti who testified at trial, was meeting every two weeks with either Agent Fleming or Agent Ackerman. He was wearing a wire. He was suing controlled by. He was recording conversations between Paul Dara and Jeff He had full access and he was doing whatever the agents wanted him to do and bringing in consistent information, establishing what the government believed the Devil's Disciples were doing. Cooperating witness number one also engaged in hand-to-hand buying. And all of these individuals were willing and did in fact testify in front of the grand jury. There was absolutely no fear or no concern that if they testified in front of the grand jury, they would somehow be harmed. They were fully amenable to whatever the government asked them to do. But on top of all that, on top of the two confidential informants and four cooperating witnesses, three of whom were active members, one of whom was living with an active member, so she was willing to give the FBI information as she heard it, they had two former members who on the leadership roles and how the organization was set up, including the former national treasurer who was able to give information to the government about how the outside chapters outside of the state of Michigan worked. So to say that they were not getting traditional investigative techniques to work in this case is a complete fiction. Unlike Corrado, unlike Giacalone, where you have, you know, Costa Rossa setups and you have individuals that don't trust anyone outside of the family, these people were walking in and out whenever they wanted. And even in Ledmester, which is the case of the government site in Ledmester, they had three cooperating witnesses, but not one of them agreed to testify in front of the grand jury. Every single individual that the government asked in this group of people to testify in front of the grand jury testified in front of the grand jury. They also had search warrants that were executed in 2003 and 2007 that were extremely helpful in getting information, especially about the outside chapters. They had a poll camera at the clubhouse that was able to monitor the coming and going of the different individuals, including seeing when the slot machines were being brought in and out of clubhouse, which was important for the gambling count later on. So to say that this Title III was necessary, especially for seven months, is a complete fiction. The government argues that the full scope of the criminal enterprise could not be determined without the wiretap, and that the wiretap authorization was necessary, that even though they had some information about various aspects of it, that they didn't have enough. And evidently, Judge Borman, who authorized the wiretap and the extensions, agreed. Is that finding clearly erroneous? Yes, it is clearly erroneous when you look at all of the confidential. This isn't a situation where they had a confidential witness or cooperating witness for a period of time and then they fell off the map. This is a situation where, in fact, when you read some of the affidavits, the confidential informants are telling them information that is later heard on the wiretap, so they didn't have the wiretap. But it leads to the information that they obtained on the wiretap. It seems like they kept getting more and more information as they investigated, and I mean, the argument is that the wiretaps were necessary to really get all of it. And you say they all, they had it, well, your first argument, there's no probable cause, and I think your argument as to the necessity kind of goes against probable cause. You're saying they had so much probable cause, it wasn't necessary. I mean, it's kind of contradictory, isn't it? Well, not if you're looking at the issuance of a Title III wiretap, because in the Title III wiretap, the issue with the Title III wiretap with necessity is are other investigative tools, traditional investigative tools, getting them information? And the answer clearly here is yes. They had, through the search warrants, through all the rest of it, they had information that was coming in, was fresh, that they could use to build up their case. This wiretap was against Paul Darra. Even in the affidavit extension request, Agent Fleming multiple times said, we have plenty of evidence in front about Paul Darra, then why are you still tapping his phone? They were tapping his phone. The necessity requirement goes to the person whose phone was tapped, where the wire is being put. If they wanted to find out other information, then maybe they should have tapped someone else's phone. But for seven months, every single time he picked up the phone to call his mother, to talk to his doctor, all of that was heard by the agent. Okay, Darra, he's the vice president, isn't he, of the Motorcycle Club? He became vice president in 2008. Okay, they can't tap his phone to find evidence of the Motorcycle Club? Judge, it wasn't necessary, because they had normal techniques. That's the tap. Normal investigative techniques was giving them what they needed. The wiretap was simply not necessary. Okay. I know I'm out of time, but can I just say 30 seconds on Mr. Darra's sentencing? Sure, sure, sure. The personal bias of the court in sentencing Mr. Darra mandates that if we get a resentencing hearing in this case, that it has to go to a just extremely egregious. First of all, the court mocked Mr. Darra's medical condition. Mr. Darra's medical conditions have been fully documented through the course of the case. He is in such horrible shape now that several months ago, the warden at his facility granted him a compassionate relief, but somebody in Washington or Detroit overrode that decision, and he's still sitting in federal prison today, blind in his left eye, losing eyesight in his wheelchair bound. And the judge simply mocked that and said, well, he's able to use a phone. I don't think he's able to use a phone now. And secondly, the court's diatribe about the use of the word fuck during the wiretap conversations that were heard in both trials, and he specifically said the use of the word fuck shows a weak mind and a disorganized mind. That's the case here with this defendant. Clearly, Judge Cleland cannot be impartial and impose an independently evaluated case, sentence in this case, given his preconceived personal bias against Mr. Darra. Okay. All right. You'll have your two minutes. I had just a clarifying question with Mr. Masseroni. You talked about going back to the wiretap again, that all of his calls, even the personal calls to his mother and other people were monitored. But in the wiretap order, once they learned that in a particular call that it was not related to the thing on the investigation, didn't the order require them to then cease the monitoring for that call? Yeah. Okay. So you're not alleging that they violated that, are you? I have no evidence to suggest that. Okay. Thank you. All right. Thank you, Judge. All right. Let's see. Let's hear from next council. Good morning, your honors. My name is Paul Lorsky. I represent, uh, Mr. Whitworth serving two minutes rebuttal at the court's discretion. Very, very well. Uh, I'd like to use my time, uh, to discuss the first issue that, uh, I raised in my brief. It's an issue that, uh, only applies to Mr. Whitworth. He was in trial group one, the, uh, individual that had both retained counsel and court appointed counsel. Just as a matter of backdrop, this started out with court appointed counsel. And shortly before trial, his family was able to retain counsel, both myself and Mr. Fitts. We met with court appointed counsel, agreed to a substitution of attorneys. And then the judge required a hearing where he wanted everyone present and asked a bunch of questions about whether or not we would complete the whole case, whether we would be prepared and whether or not Mr. Whitworth would be responsible for repaying the amounts that were paid by CJA. And then Judge Cleveland allowed the retained counsel to be standby counsel and to assist with trial. And there was a statement, I think on the study. I fail to see how there's an appealable issue if it's by consent. That is not exactly what was stated. What was stated on the record by Mr. Pitts is that if required, we would assist with, or we would, uh, follow whatever order the judge required us to follow. And we would not interfere with Ms. Stout, who was court appointed counsel. And, but when you have counsel of choice, that attorney has to be responsible for the defense of the case. And as the court order clearly states, it says that the retained counsel could not interfere or impede in the court appointed attorney's direction of the defense. That's the whole point of having an attorney is being responsible for the nature of the defense. That's the appealable issue. But there's, there's no, there's no conflict with the two attorneys. The two attorneys, my understanding are really in sync as to the strategy here. And there really is no difference in, in what the retained attorney would have done as, as opposed to the court appointed attorney. And, uh, so it's really kind of a hypothetical. But that's not, but that's not the test for, uh, counsel of choice. What your honor is referring to is whether we would be raising an ineffective assistance claim as the U S Supreme court stated in Gonzalez Lopez. That's irrelevant. The fact that the, uh, the defendant is being denied his counsel of choice. That's what has to be established. And once that's established the fact that, or any hypothetical, as your honor has indicated as to how the case would have been done differently is irrelevant. It's the fact that the defendant was denied his counsel of choice makes it structural error. So it was, it was the request for substitution, which was made, I think two months before trial. Was it timely? It was a timely request. Well, I don't know of any case that says that it has to be out three months or five months or even two years to that. Don't you think the trial would have to have to have been delayed? If, if judge Cleveland had allowed a month before trial, if we would not have been prepared, I agree that we would not have been able to, uh, or judge Cleveland would have been in his right to not allow us to appear, but we were prepared. It was two attorneys. We were working on the case. As it turned out, the case was delayed, uh, another month by, uh, uh, other means. Uh, so we weren't fully prepared to go and we were prepared. And that would be a reason for judge Cleveland to deny counsel of choice. But that wasn't the case here. We weren't prepared. We were prepared to go, but we were not allowed to conduct the defense. And that's really what an attorney is supposed to do. All right. Any further questions? Judge Heinrich, judge Donald. No. All right. You'll have your two minute rebuttals. Thank you. Let's hear from, um, attorney, uh, daily. Good morning. Uh, Craig Daly on behalf of Jeff Smith. I will be reserving two minutes for rebuttal that leaves me very well. Thank you. Six minutes for my opening remarks. So in this appeal on behalf of Mr. Smith, I've raised a six, uh, excuse me, 16, excuse me, 16 substantive issues. And as judge Griffin indicated in his opening remarks, uh, some of these issues have been joined in by other defendants and we have joined in to arguments by, uh, co-defendants as well. Uh, what I want to do in the short time that I have is to focus on the instructional errors contained in my first argument of my brief. In that first argument, I have set forth eight separate jury instruction arguments, but I want to limit it to the three most significant and critical issues, both for the defendants and for the court to decide. First, I want to address the elements of the, uh, RICO charge. Second, the reasonable doubt instruction. And third, the assault with intent, uh, instructions under Michigan law. So the first, uh, dispute between the parties is the standard of review. And we have raised these as constitutional issues under due process and the Middleton, uh, decision and also questions of law. And those are reviewed by this court de novo, not an abuse of discretion as the government claims. So first on the RICO conspiracy elements, the government invited the district court and in fact insisted that there would be language. The hypothetical existence of all the elements would be instructed to the jury and they were wrong, both as a matter of law and as a practical matter. As a matter of law, this court is bound by the decision in TOCO, that is a published decision regarding what the elements are of a RICO conspiracy. Was that the issue in TOCO, whether RICO conspiracy can be, uh, perspective, the, the would be language or was TOCO, uh, or was that not an issue in TOCO? Judge Griffin, the issue was what are the elements of a 1962, 1962 D requirement, number one, and whether or not there was sufficient evidence. So you're correct to the extent that they didn't address the actual question of jury instructions, but what we do as judges and lawyers, we look to the announcements of the courts about what the elements are, and then we draft jury instructions consistent with the law. So that's what we've done in the pattern jury instructions. And unfortunately, the Sixth Circuit does not have a pattern jury instruction on RICO conspiracy. So what we do and what happens across all of the districts and all of the circuit courts is we take the actual language like in TOCO, where they said specifically that proof of a charge under 1962 D requires proof that the association or enterprise existed. The name defendants were associated with it and agreed, that's the important language, to participate in the conduct of its affairs, which affect interstate commerce and through a pattern of racketeering activity. So what we did in this argument is we looked to see whether or not that language was consistent with the pattern and model jury instructions in other circuits. And the Eighth and the Eleventh Circuit agrees with the ruling in TOCO. Okay, how about the Second, Ninth, and Tenth? So the Second, Ninth, and Tenth, Judge Griffin, are in disagreement, so we have a in the circuits. But even in those particular circuits, there are conflicts among the panels within each of those circuits. Okay, here the charge is conspiracy, is it not? Yes, it is. Doesn't conspiracy look prospective that a criminal enterprise is established or will be established? That kind of a conspiracy looks forward. And so here, conspiracy that would establish, doesn't it fit with the charge? In this case, the jury was instructed on general principles of conspiracy, as you suggest, Judge Griffin. But there is a big difference between not being completed, which is the language in the general conspiracy instruction, and not existing in any form. They're not the same thing. So not existing in any form is a lower standard for the government to be. So that would-be language is different than what the court has said, for example, in Salinas. So legally there's a problem, but there's also a practical problem, Judge Griffin. So when you say, isn't the would-be language consistent with conspiracy law, what is a jury supposed to do? Juries determine past events. This is the practical problem of these jury instructions. They are not asked to speculate about what might happen in the future or to look into a crystal ball to figure out what it would be. That's not their job. Their job is only to look to see what the facts were, make a determination of what the facts are, apply the law, and reach a conclusion. So that would-be language that the government invited, invited the district judge, insisted that they include on all the elements, creates this intensible position for a jury. And I notice that my time is up unless there are further questions. I'd like you to talk a little bit about the enhancement as to the drug premises. I think that's an important issue. You just take a minute or two to talk about that. Yeah, absolutely. Thank you. So there was a lot of discussion about what would be required for a specific finding, a specific verdict under the racketeering acts. So what happened in this case is the government only charged a violation of federal law without specifying in the indictment the amount. And the significance is that if you're convicted, obviously under a RICO conspiracy charge, the maximum penalty is 20 years. It can only be enhanced to a life offense that is mandatory if it's charged in the indictment. So the government did not charge an of acts. So the racketeering acts would have to specify that the possession with intent to distribute was over 500 grams. They didn't do that. So we asked Judge Cleland to instruct on the underlying racketeering acts as charged in the indictment. He said, no, I'm not going to do that. But what I'm going to do is I'm going to have the jury make a special finding that there was possession with intent to deliver over 500 grams of meth never charged as a racketeering act, which means that the sentence on the conspiracy charge must be vacated because the government never charged that as a racketeering act. Does that address your question? Any further questions at this time, Judge Sir Heinrich, Judge Donald? All right. You'll have your two minutes rebuttal, Mr. Daly. Thank you very much. Counsel for Van Diver. Please, this honorable court, good morning, your honors. My name is Mark Satawa. I represent Mr. Van Diver. I joined the arguments of other counsel made here today. I will note that the government objects to Mr. Van Diver joining two sentencing arguments. I will leave that to the court's discretion. I did want to point out that there still is a pending motion to adopt by reference issue four of Jeff Smith's brief concerning the widespread use of hearsay. My motion was document 75 filed March 18th. It's government issue 3B in their reply. I just want to bring that again to the court's attention. What's the objection for you adopting by reference to the other counsel? I failed to do it earlier, your honor. It was just a clerical oversight by my part. You say it was just untimely? Is that what it was or something like that? I didn't do it in my original brief and I didn't do it until after the government had filed their replies. Your honor, I want to spend the bulk of my time talking about the issue involving the agent in charge, Agent Fleming, in his testimony. Testimony that was persuasive, that filled in the gaps, that made the nine suspicious, that talked about having a cold meeting the purchase of meth precursors. Your honor, it is right out of the risks talked about in Freeman. Freeman is binding precedent in a published decision on this court in this circuit. There certainly is a circuit split and we do have cases like Kilpatrick, which I would suggest this case, Mr. Van Dyver's case, is factually different from. But Agent Fleming's testimony reeks of all the risks that are pointed out in the cases like Freeman, Kilpatrick, and others. When they talk about how the agent testifying in this way violates confrontation, usurps the role of the jury, and it avoids all of the requirements on the proponent of the evidence under 702 to present that witness as a 702 witness. Your honor, I find it interesting that the government's brief hammers on the idea of only one of the government's requirements under 701, that being the idea of whether or not the witness is testifying by personal knowledge. It ignores the other two requirements, whether or not the, whether or not requirement number two being whether or not, I'm sorry, requirement number three is what I wanted to talk about, whether or not the witness is a disguised 702 witness, whether this was really 702 testimony. And of course, the second requirement being, is it even helpful? Is this something that the jury doesn't understand in its own personal experience? So unlike Kilpatrick, where the government witness was, first of all, interpreting texts, not recorded telephone conversations, but was or the boss as meeting specific technical things like the main contract or a specific individual, they never got into that kind of continuing summary testimony that, oh, by the way, just happened to always support the government's theory of the case. I find it extremely, extremely interesting that the government, as I said, has gone, goes on for pages about how agents Fleming acquired all of this personal knowledge. And then in the very first factual specific example, they discuss on page 126 of their brief, the Q and A discusses based upon the context of the call, as well as the investigation that was going on at the time, what did you understand Mr. Rich to be referring to when he said it's here now? The next question, and in your opinion, based upon your investigation in this case, and your review of the calls in this case, based upon that and my experience working drug investigations, yes. He goes on to in that exchange and your honors have this as part of the rule five material that has been submitted in the case, you have the actual call that was played for the jury. And it's an exchange, your honors, that doesn't need interpretation. But one of the problems with all of this is, as Mr. Craftsman cited in his brief, is a conversation where Mr. Van Diver and a co-defendant are talking about Mr. Van Diver being sick. And the co-defendant saying, well, why don't you go get some cold medication on that on the tape itself. If your honors listen to it, Mr. Van Diver is heard coughing. Your honor, as Mr. Craftsman does a very good job of arguing in his brief, a lot of that material is not only missing from the government's brief, but it appears very clearly in the call. Your honor, Kilpatrick is an interesting case because the government wants to analogize this situation and claim that it is more like Kilpatrick than Freeman, which is completely untrue. I see that my time is up, so I'm happy to answer any questions, but I would finish by just simply stating this. This is not a case where, like in Kilpatrick, they were interpreting text where the agents were not giving opinions about the case, but rather specific words. In this case, Agent Fleming summarized testimony, advanced the government's theory of the case, and was constantly advancing an idea that normal phrases and otherwise innocent statements by these co-defendants were made into insidious statements made in furtherance of a conspiracy. This is as different from Kilpatrick and as similar as Freeman as Knight is today, your honors, so I appreciate time, and if you have any questions, I'm happy to answer. You'll have your rebuttal. Any questions at this time, Judge Heinrich, Judge Dunn? Okay, let's hear from the next counsel. It pleases the court, Sidney Kreisman, an attorney representing the defendant Patrick McHugh. I would first turn to my sentencing issue, which was issue seven, issue six. In this case, the district court had a false memory. Quote, I recall also testimony that he, McHugh, always had at least an eighth of an ounce, an eighth ball of methamphetamine. The court went on, it's not a personal use quantity, that's a distribution quantity. This was a false memory. The sentencing was almost four years after the trial in this case. The trial in this case concluded February 20, 2015. The sentencing was November of 2018. There was no testimony at either trial one nor at trial two that, quote, McHugh always had at least an eighth of an ounce, an eighth ball of methamphetamine. The government does not dispute that. They've wronged in stating that an eighth ball, an eighth of an ounce was a distribution amount. In fact, it was a personal use amount. As per the testimony of three government witnesses, I cite them in both of my briefs, both the original brief and also as to the reply. These two errors by the court prejudiced Mr. McHugh at sentencing. Secondly, the court clearly erred in finding that McHugh was responsible for the murders of Thomas Thacker, William Bosch in Indiana, and of Charles Eisler at the Cadillac Michigan Clubhouse. There was no testimony that this. There was no testimony that McHugh was in that state. McHugh was never a member of either one of those clubs in Indiana or the Cadillac Clubhouse. There was no testimony in this case that McHugh had anything to do with assaults, obstruction of justice, thefts. But the court held McHugh responsible for all of these. And in this, he clearly erred. The government does not disagree with me that there's no evidence that McHugh participated or knew, even knew, about any of these various acts. The one exception was when McHugh heroically attempted to stop the forcible taking of the motorcycle of Jeff Arnold in Alabama in 1999. The government acknowledges that McHugh was never a national officer. He never was an enforcer of the rules. McHugh, for a period of about a year in 1999, as per the Alabama chapter, cleared that the trial judge erred in determining that McHugh was responsible for the murders, extortion, acts of violence, thefts of motorcycles, and that this sentence of 31 years to McHugh was procedurally unreasonable for the reason that the court clearly erred and based it on clearly erroneous facts. I have cited the Gall decision, but also the Supreme Court's decision in Tucker, and that this is a violation of the due process of law. I would turn to my first issue, which is constructive amendment. The defense in this case of McHugh was that there were multiple conspiracies and that he was not a participant in the conspiracy in count three, the conspiracy to manufacture, distribute, or possess with intent to distribute methamphetamine, and that he was not a conspirator as to the first count as well. The trial court gave an instruction in this case on multiple conspiracies. That was at the court request of McHugh, as well as the request of Wichert, and all of the defendants in this case joined in there. The government in its brief acknowledges it. The government also agreed to that as well. Specifically as to McHugh, it was the position of the defendant in the court expressly stated this in its instruction that McHugh had separately conspired with Jeff Arnold in Alabama to manufacture methamphetamine, and that he conspired as to this specific instruction. Based on that instruction, which was before the argument of counsel, I argued it, and the other attorneys also argued it on their behalf. After a week of deliberation, the jury requested further instruction from the court, and what the jury wanted to know was whether the convicted defendant of count three, the conspiracy to traffic in methamphetamine, the defendant had to have conspired with a co-defendant in this case. I specifically objected. This would have, the court suggested instruction would have destroyed my defense in this case. Additionally, what the court did in this case was to instruct the jury and eliminate the requirement of a nexus with any of the co-defendants in this case. This is the count three, if you can see it. This is the indictment, 23 named defendants in six states, California, Alabama, Ohio, Michigan, Indiana, and I've missed one additional one also, and it covers the population of 77,000, and what the court's instruction did, I know that I'm over if I can have just one more minute, was to eliminate the nexus with the other defendants in this case so that the defendant would be charged with a conspiracy with anyone within those six states, 77,000 people, and it destroys the defense in this case of multiple conspiracies that the court instructed. It destroyed my defense in this case. This was not only a violation of the Fifth Amendment right trial by grand jury, it was a violation of the due process of law. Without notice and retroactively after the conclusion of the trial, the trial court eliminated my defense after giving an instruction on multiple conspiracies. All right, thank you. Any further questions at this time? All right, you'll have your two minutes for rebuttal. Let's hear from Ms. Davis. Thank you. Ms. Davis, your microphone is muted. I apologize. Good morning, your Honor. This is Laura Davis for David Drostowski. I would ask to reserve two minutes for rebuttal. Very well. The district court based Mr. Drostowski's sentence on clearly erodious facts. Not only the invention of additional injuries to Mr. McClure in the assault case that ran consecutive to all the other sentences, but also in regards to establishing the weight of the drugs, the base offense level for the drug-related charges. The court invented a timeline of Mr. Drostowski's involvement in this case based on nothing in the record. The court attributed Mr. Drostowski's involvement with the case. The record is clear that Mr. Drostowski was not involved with these people during this time. The court, while it's actually, I went back and read, it's not clear which drug the judge ultimately based the base offense level on. There was argument about the weight of the methamphetamine. There was the court's adherence to its belief that pure or actual methamphetamine had no definition in law or guidelines and that it just meant uncut meth. There was a pseudoephedrine spreadsheet that the government presented that the court did not take time to contemplate, to deliberate over, to consider whether or not pseudoephedrine purchased after Mr. Drostowski's incarceration on this offense should count towards the total weight or pseudoephedrine that was involved. Should pseudoephedrine be counted if it's Jesse Williams cooking by himself or April Sykes cooking by herself, people who were not necessarily involved with the devil's disciples or the devil's disciples, the alleged conspiracies. All right, Ms. Davis, your client received the below guidelines sentence. If we were to adopt your arguments, would the calculation of the guidelines, the ultimate number would not change. However, the number where you pulled back from would change. Is it harmless error, the alleged errors that you bring up? No, it is not harmless error because what this court held in Morrison that a guideline calculation error is harmless if the district court specifically would have imposed the sentence regardless of the guidelines range. That is not what we have here, that there was this error calculated in the guidelines range and you can't tell from the record. The court didn't say, well, if I'm wrong, I still think this is the appropriate sentence. It was, you know, the court made no acknowledgement of the possibility of being wrong and just imposed the sentence based on its belief about weight, about injuries that Mr. McClure did not suffer, about length of involvement that was not based in fact. So, no, it is not harmless error when you look at the sum total of everything the court took into consideration in sentencing Mr. Drozdowski. And the court also within that sentencing sphere rejected the recommendations and requirements of 18 U.S.C. 3553A6 about comparing with similarly situated defendants. I think if the court rejected to, you know, why does the sentencing commission produce reports if not for courts to rely on them in sentencing defendants? Trial counsel went to the extent of comparing local defendants and the court rejected all of them. And Mr. Drozdowski is just not that special. He can be compared to other defendants. Reassignment on remand, the district court, I have the same perspective this court does. I have only seen the official record of the case. And the district court again and again rejected clearly stated law, clearly stated guideline definitions. It rejected clear facts. It adhered and was intractable about its beliefs about facts of the case that certainly were not actually facts. They were falsehoods. And I'm not saying why. I'm saying he's just not wanting to be dissuaded from his version of the event. Okay. All right. Any further questions, Judge SirHeinrich, Judge Donald? All right. Ms. Davis, you'll have your two minutes rebuttal. Let's hear from Mr. Morgan. Morning, Your Honor. Morning. Sorry, I get technically confounded there. I'm sorry. Robert Morgan, on behalf of Michael Kenneth Rich, not related to Vern Rich that was referred to in a telephone conversation earlier. Mr. Michael Kenneth Rich, a 14-year honorably discharged veteran of the United States Coast Guard with 100% disability pension and PTSD. When the government asked Vern Rich, well, what did Michael Rich do down there in Alabama? The answer was absolutely nothing. The government in a sentencing memorandum in response to that testimony, which we obviously referred to in connection with the Rule 29 motion, said that Mr. Rich was a useless parasite. Whether or not the judge took this from the memorandum, the judge characterized the answer as indicating that Mr. Rich was a person of low level energy or lazy. Nevertheless, almost seven or eight weeks later at the sentencing of a co-defendant, the judge referred to Michael Rich while there was a discussion of the various roles of people and their individual backgrounds. With regard to Mr. Rich, the district court said he was a person with one foot out the door and one foot in the grave. One foot in retirement and one foot in the grave. I think that comports with the reality of the evidence and the lack of evidence with respect to Mr. Rich. The government submitted a sentencing, they called it a treatise of 300 pages or so, and the district judge is to be distilled to a sentence, one sentence. If you were a member at the time anything was committed anywhere in the country, then you're responsible. If you were a member at the time that anything was committed anywhere in the country, then you could reasonably foresee that. Both the district court and the government referred to Tocco. I think Tocco is extremely helpful. Tocco too, Jack Tocco was the boss, the boss of the Detroit Mafia. He had a list of defendants, notorious names, Vito Jackalone, Anthony Jackalone, and so forth. Jack Tocco was the boss and two Mafia soldiers, soldiers, underlings of the boss, Paul Corrado and Anthony Snovitoco, inspired to commit a murder, the murder of Harry Bowman. And Jack Tocco was not found to be responsible for that act. So even in spite of some evidence that Snovitoco reported, made a report to a capo, Anthony Corrado. So the point is mere awareness does not create criminal responsibility. And in this instance, mere membership in a motorcycle club does not cause or equate to criminal responsibility. The district judge at the time of the ruling on the rule 39, the same time of sentencing three years after the trial, noted that the motorcycle club... Mr. Morgan, do you think Devil's Disciples is just a mere motorcycle club, nothing more? It's a motorcycle club and some of the members are criminals, no question about that. Okay, do you think, do you think it's an enterprise? Do you think they conspire with one another? At least some of them do? I think the case law suggests awareness of the overall conspiracy is not sufficient for individual responsibility. And anyway, this is more than a mere motorcycle club, is it not? Pardon me? This is more than a mere motorcycle club? Well, to use the district judge's call it, the motorcycle club was national as well as a local structure, roughly organized, but quite cohesively organized in a manner to achieve both, legitimate associational and illegitimate criminal purposes. Oh, okay. All right. So you acknowledge that it has criminal purposes to it, the motorcycle club? I acknowledge that there were criminals and criminals conspired in various acts, but whether or not Michael Rich is responsible... Sure, that's a different issue. I understand that. Yes, sir. But the guidelines of life were driven by two things, acts of violence and drug quantity. Box Canyon, there was actual testimony of race just by witnesses, Doug Smith and John Altman. They testified about what their expectation as club members when they went to that venue. They expected that colors or patches would be taken from the people that turned out to be the victims. I think we understand your argument, Mr. Morgan. You could use your rebuttal time now if you want, or you can save it. I guess I'll save it now. Okay. Any further questions at this time, Judge Sir Heinrich, Judge Donald? All right. Let's hear from Mr. Robinson. Good morning, your honors. This is Matt Robinson on behalf of the appellant defendant Victor Castano. Focusing in Mr. Castano's appeal, he has some unique issues that I'd like to address. The first, of course, is that the incriminating statements were made by Mr. Castano pursuant to a proper agreement, a proper letter, a proper letter and during a proper interview. Those statements were used by the government's case in chief during the grand jury proceedings and then later introduced against Mr. Castano at trial. It's our allegation and I'd like to address both prongs of that. There's first the violation and the grand jury proceedings and, of course, the government is arguing that the term case in chief listed in the proper letter refers only to a trial of the defendant, but the proper agreement states that the government just focuses on that one phrase, patient case in chief, and it doesn't say case in chief at trial. It says case in chief during any criminal prosecution. So the government pretending that this refers only to a criminal trial when that's just something that is assumed by the government when they presented this in the proper agreement. Does it make any difference if we affirm Judge Cleland's finding of fact that there was a breach of the proffer by your client that he failed to comply with? I see the problem with that, but I don't think that changes the error that occurred at the beginning. So the fact, even if, and I'll jump, I'm sorry to interrupt you, Your Honor. No, if Judge Cleland is correct or not clearly erroneous that there was a breach of the agreement, then all these statements come in both, don't they come both into the grand jury and the trial? What would prohibit them from coming in, I guess? I guess in answering your question, if there was truly a breach of the agreement by Mr. Cassano, then they could be introduced and the proffer would be unenforceable. However, at the time, there's several facts in the record that demonstrate that Mr. Cassano did not, in fact, breach this agreement. And that finding is in fact clearly erroneous and in fact, based upon false statements or false perception of Mr. Cassano's statements and the omissions, because they're certainly not saying that Mr. Cassano lied during the proffer. Instead, the alleged breach is based upon Mr. Cassano's alleged omissions. Sure. Isn't there some testimony from his girlfriend that he admitted that he was not forthcoming with all the statements that he was trying to make? However, I'm sorry again, I talked over when I'm on this computer, I apologize for that. Yes, those statements were made, but the letters, they're referring to letters and testimony concerning statements that he made allegedly one to two years prior to the proffer interviews. How can statements that he made to his girlfriend before he ever actually agreed to participate in a proffer interview pursuant to a proffer letter offered by the government, how can those statements possibly demonstrate that Mr. Cassano was lying or omitted things on purpose from that proffer interview a year to two years later? I see my time's already up. Would you like me to continue, your honors? Any further questions? You raised the drug premises enhancement. That was my question. Which I think is an important issue. Can you address that? Yes, your honor. With respect to the drug amounts and particularly with respect to Mr. Cassano, one, we would agree completely with the argument concerning the amount of methamphetamine that was used in the jury findings, but then we would also point out that with respect to the sentencing guidelines, the court failed to make an appropriate relevant conduct finding as to drug amounts. I'm more concerned about the drug premises argument. I think you argued that there had to be a finding that your client controlled the drug premises as opposed to the conspirators. You cite the Eighth Circuit case, United States versus Miller on it, also a contrary opinion by the 11th Circuit, United States versus Holmes. It goes the other way. I'm interested on the issue here. I had that same question because you argued that the enhancement should not apply for maintaining drugs on premises. For your client, I'm interested in why that should not apply to your client in this set of facts. Well, I'm referring to, I quoted Hernandez when we're talking about that. The government's argument is that the enhancement should only apply to Cassano if he personally maintained the premises. That was clearly not the case. The court applied this through relevant conduct which I would argue also was inaccurate to begin with because the court conflated Pinkerton liability with relevant conduct. When we're looking at the case law, the maintaining of a drug premises has to be personal. If you're dealing with it through failure to understand that that is not sufficient to apply that enhancement. Now, the Sixth Circuit hasn't ruled on the appropriateness of applying this enhancement. You're correct. You're right. We cite the Eighth Circuit and Miller. We would argue that that's not sufficient proof. We would ask the court to side with Miller and its finding on that because the Sixth Circuit hasn't addressed this specifically. Isn't the statement in Miller, counsel, isn't that dicta? I mean, it has a statement which agrees with you as to the principle of law, I guess, the interpretation of the enhancement, but that wasn't really the issue in Miller, was it? Well, in terms of whether or not it was the crux of the issue in Miller, I have to concede that it was part of the court's analysis in that case. The issue was squarely raised in front of the Eleventh Circuit in Holmes. Tell me what's wrong with the Eleventh Circuit's opinion in Holmes because that really does address the same issue you've raised. I know Holmes is an unpublished opinion, but nevertheless, we would create a conflict with the circuits with the unpublished opinion. What's wrong with the Holmes opinion? Well, what's wrong with the Holmes opinion is that it fails to recognize the plain language of the guidelines, which states that the defendant has to maintain the control of the premises. It recognizes the language of it, but it says that it applies to their co-conspirators, and that's the only way it makes any sense. Well, it recognizes the plain language. I'm sorry, I didn't hear you. I was just apologizing for interrupting you again. Oh, okay. Well, go ahead. But I guess my best answer for that, Your Honor, is that that decision is incorrect because it's reading something into the guidelines that isn't in the reading of the guidelines. It's not on the face of the guidelines that says you can also apply this through relevant conduct. If anything, it's going back into commentary, perhaps, or something else that gave the court the idea that relevant conduct applies to that enhancement. But on the plain language of the guideline itself, it says that the defendant maintains the premises, and we would argue that relevant conduct is not part of that analysis. All right. Any further questions, Judge Donald, Judge Siridric? All right. Mr. Robinson, you'll have your two minutes rebuttal. Let's hear from the government. Thank you. Good morning, Your Honors. My name is Sheldon Light. I represent the United States. I'm going to attempt to address most, if not all, of the issues that have been raised by the court. But, of course, if there are other issues that the court wishes me to address or has questions about, I'm open to trying to answer those questions as well. The first issue that was discussed by Ms. Masseroni was the question of necessity for purposes of the Title III wiretap that was authorized by Judge Mormon in this case. As Judge Griffin observed, she doesn't address the question of probable cause. In fact, her argument seems to be based on the fact that there was so much probable cause, the government didn't need a wiretap in this case. But that's not really the test. The wiretap doesn't have to be a tool of last resort. What's required is that the agent and the government consider and evaluate other potential means of investigating the criminal conduct in question and provide information about those other means to the court to whom the wiretap application is addressed so that the court can look at those analyses and decide whether or not the necessity test is met. And that's what happened here. If the court looks at the wiretap application, there are several pages in which the agent discusses each of the potential other means of investigating the case and why they would not be sufficient to thoroughly and effectively investigate it, especially to the point of identifying the leadership and the leadership roles of individuals within this and sources of the drugs that were being distributed by the members of the enterprise. And the fact that the wiretap was directed to the phone of Mr. Dara doesn't limit the analysis to whether or not it was necessary only with respect to Mr. Dara. The necessity analysis goes to the investigation. And here the investigation, as it was clear from the affidavit, covered the entire scope of the enterprise. And the purpose was to look at the communications between Mr. Dara and others. In fact, a good part of the affidavit goes to showing the frequency of his communication with Jeff Smith, the president. I wanted to interrupt you because you have used the term enterprise several times in your statement. I apologize if I get you out of your order. But you would agree that a motorcycle club or any motorcycle club is not necessarily a RICO enterprise. Wouldn't you agree with that? For it to be an enterprise, there has to be racketeering activity. There has to be a pattern of racketeering activity connected with the enterprise. And the other elements of enterprise have to be shown in terms of the continuing unit, the common purpose, and the longevity of the enterprise. And so that's my question. Because many of these co-defendants allege that their individual acts were not a part of any concerted action to meet that definition. So for the government, can you again just speak to the standard that the government uses in this case to prove association in this enterprise? And I don't want you to go back to the testimony, I mean, to your evidence with respect to each of the defendants. But there is a standard that the government has espoused that the conduct of each of these defendants meets in order to bring them within the ambit of this. So what's your general standard? Is it the three things you just mentioned? Is that the complete standard? Well, the standard is to look at all of the factors that I've discussed or that I've mentioned to look at the organization, to look at the common purpose or purposes of the organization. And that's what's shown here through both statements of individuals who are members of the organization and through their roles in the organization and through the acts of members of the organization, of distributing meth, both within and without the organization in vast quantities, in manufacturing meth. And so your honor has suggested that I not go into the details and I won't, but there was abundant evidence as to the roles of each of these defendants and the members of the organization who testified at trial as to their roles in furthering the common purposes that turned this organization into a racketeering enterprise that conducted its affairs through a pattern of racketeering activity. And that activity included the drug dealing. It included the motorcycle thefts, included the gambling, the illegal gambling that took place at many of the clubhouses. So there was a massive evidence taken together that showed the various common purposes of the racketeering enterprise that can constitute a pattern of racketeering activity. I'm not sure that answers your question. It does, but I just want to again go back to Mr. Morgan's point earlier. In this enterprise, this motorcycle club, he said there were some people in there who were criminals and there were others who, of course, certainly are not charged in the government's indictment, but you admit that the conduct of all of the members of this organization was not at par. There were people obviously who were a part of the club, who weren't swept within the ambit of this action, correct? Well, I can't speak to anybody other than the 41 people who were named in the indictment in this case. There were certainly more members of the organization than the 41 named in the indictment. And that's my point. Some of them maybe could have been charged, some of them maybe could not have been charged. But as far as the ones indicted, our position is they were members of a racketeering enterprise. And to, you know, Mr. Light, how many, how many of them pled guilty? Uh, all of, all of them, except for these defendants, uh, who went to trial, either pled guilty, I believe in a couple of occasions, uh, with minor members, they were given, uh, a pretrial diversion, but don't quote me on that. That's my best recollection out of the 41. My focus in this case has been on the appellants, uh, here. Uh, but most of them might have pleaded guilty or were given some kind of a pretrial diversion, but only one. So, so nine, nine of them went, nine of them went to trial and the other ones all pled guilty. That's right. Okay. Essentially. Now as to Mr. Rich, just to get back to judge Donald's question, um, um, this Morgan, uh, minimizes Mr. Rich's role in the organization, but he was a long time member. He joined in 1988. Uh, he started in Detroit, uh, uh, or in Bay city. Then he moved to Detroit. Then he moved to Port Huron and then he moved down to Alabama where he was involved in various of the chapters for a while. And he was directly involved, um, in the obstruction of justice relating to Mr. Castano. In this case, he was one of the people who put pressure on Keith McFadden to testify falsely at the earlier trial of Victor Castano. Uh, so he was an act and he wasn't just, you know, not, not part of the club anymore. He remained part of the club and part of the leadership in putting pressure on McFadden, uh, to obstruct justice in the trial of a member of the devil's disciples. And finally, with regard to eight balls, um, uh, yeah, there may have been some misrecollection by, uh, judge Cleveland as to whether or not he always possessed eight balls. But the fact is that there was testimony that while he was a member in Port Huron, Michigan, he received eight balls, I believe it was from Jeff Armstrong, uh, or Jeff Arnold, uh, for purposes of distribution. So at least in those instances, it was a distribution quantity because, uh, there was testimony that he distributed those eight balls of meth. To get back to, uh, some of the other issues in this case, um, Mr. Komorski has talked about the court's counsel. I'd simply suggest to the court that judge Cleveland would have been totally within his, uh, uh, within, within his authority to simply deny the motion for substitution of counsel that was made at this point in, uh, uh, in, in the preparation for trial in this case. This was a big case. Uh, it involved massive amounts of, uh, uh, information and there was a court appointed lawyer who had represented Wittworth from the beginning, uh, Ms. Stout, who had put in $36,000, I think, uh, worth of CJA work on the case, had reviewed 25,000 pages of, uh, pre-trial discovery. Uh, uh, she was fully prepared to go to trial and at this late date, uh, Mr. Wittworth sought substitution of counsel. Judge Cleveland could have simply denied that, but he attempted to accommodate the needs and the wishes of Mr. Wittworth, and I believe he did so in a reasonable way. And there's a couple of things that, um, uh, the court should certainly keep in mind in evaluating this issue. One is that counsel said clearly, and this is in the record, it's referenced in our brief, that they could work, that is Mr. Pitts and Mr. Komorski, could work with Kim Stout in preparing for trial and in trying this case. And the other important thing is that in writing, in their final response to the court's request for information, they said, very clearly, that they could not be prepared or could not guarantee that they would be prepared for trial, uh, and could not guarantee that they would not be seeking an adjournment. Um, so, uh, I believe that Judge Cleveland properly exercised his discretion in deciding, uh, to allow them to come into the case, ultimately to allow Byron Pitts, uh, to sit at counsel table with Ms. Stout and allow them to work together as they said they would be able to work together. And there has been no indication of any subsequent, uh, subsequent conflict with or problem with them working together. There's simply no basis on which to find that Mr. Whitworth was actually denied counsel of his choice. His primary counsel of choice, Byron Pitts, cross-examined many of the witnesses and gave the closing argument for Mr. Whitworth's case and never suggested that he was being impaired or impeded in, uh, representing Mr. Whitworth by working with Kim Stout. Mr. Daley, uh, addressed, uh, the issue regarding the elements of legal conspiracy under 1962D. And, uh, again, as Judge Griffin, I believe, pointed out, under the Salinas case from the Supreme Court, 1962D is a conspiracy, uh, uh, charge, uh, and conspiracy contemplates, uh, actual events, uh, and contemplated events, uh, events that would take place, uh, according to and within the bounds of the conspiratorial agreement. And it was based upon, um, uh, Salinas, uh, and the analysis provided by the government that Judge Cleland decided to give the jury instructions as to the RICO conspiracy that would allow a finding of conspiracy both if the enterprise existed or if the enterprise would exist. Now, uh, counsel point to the Tocco case as representing, uh, a holding by this court that 1962D requires existence of an enterprise. And there is language, passing language in Tocco that says the elements of the offense include proof of the existence of the enterprise. But that wasn't the issue in Tocco. The issue in Tocco was sufficiency of the evidence to prove the existence of an enterprise. Both the government and the court in that case assumed, assumed that existence of an enterprise could or should be an element of the offense for purposes of that case. And the case was approached in that way. And, and, and, and this court analyzed the sufficiency of the evidence to prove the existence of the conspiracy, but it did not address the question of whether it was a required element of the offense. And I point this court's attention to the Harris case out of the 10th which is in, in, in Harris, the 10th circuit was presented with a situation very much like, uh, this court has before it now. There was a prior case in the 10th circuit called Smith that is in fact, uh, I think the only case relied upon by the, uh, defendants, uh, in their briefing on this issue that had dicta just like the dicta in Tocco. And the 10th circuit in Harris did a analysis and concluded that, uh, in a jury instruction case, uh, actual existence of the enterprise is not an element of the offense. And that's consistent with, uh, uh, uh, Aplin's, uh, out of the second circuit. And it's consistent with the pattern jury instruction in the third circuit. Uh, other circuits have pattern jury instructions that do not allow or do not address the question that's addressed by Harris, that's addressed by Aplin's, that is addressed in the careful analysis of the third circuit. If this court wants to look at a careful analysis in a pattern jury instruction of this issue, I would recommend the third circuit. Bottom line is, um, uh, the instruction was correct, but even if there, if there's some question about that, the fact is this case was tried and approached in terms of actual existence of the enterprise. The enterprise was proved and the evidence was certainly sufficient to show the enterprise, as I've discussed earlier in this argument. Okay. In regard to the instruction as to would have, uh, the would have language. I mean, you cite authority on the issue, direct authority from the second ninth and 10th circuit. There is dicta in our court and other circuits as to the need to, to prove an actual, an actual existing conspiracy. Is there any direct authority contrary to the direct authority to the second ninth and 10th circuit cases? Not that I'm aware of. Okay. Even in district court. I can't say I've looked at all the district court cases, so I can't say whether I'm not, I'm not aware of any direct authority contrary to your position. That's, that's all. I just, and if you know what, if you know any, I'd just like to know it. That's all. I certainly don't know of any controlling authority, obviously. I can't say that a district court opinion has addressed the issue one way or the other. As far as you know, there is no direct authority to the contrary. I know in my research, I came across district court cases that support my position, but I can't say conclusively that I found none that went the other way. Okay. Thank you. That's the best I can do, Judge. With regard to Mr. Satawa's issue, the Freeman issue, this case doesn't present a true Freeman issue. The one snippet of testimony that Mr. Satawa focused on and read onto this court was a brief bit of the testimony on the fifth day of trial before there was any Freeman objection. What happened on the fifth day of trial is that through the testimony of Agent Fleming, the government introduced a series of recordings that revolved around some of the undercover buys that were made using John Pizzutti. In talking about one of those recordings, the agent briefly interpreted that recording as reflecting that a party to the conversation had the meth or had meth for somebody else. That was unobjected to. There was no objection at that point in time. It was a passing reference. It certainly should not be considered as reversible error at this point in time. Now, Mr. Satawa talks at length about characterizing the testimony of the agent as being in violation of Freeman, but there are only a couple of particular instances cited in the briefs in this case, and I've addressed both of them in our brief. Even if there was some element of Freeman error there, it's not a sufficient basis upon which to reverse the conviction here. In fact, in both of those instances, the testimony had the purpose of placing the recording in context so that then the jury could listen to the recording in context and reach its own conclusion as to the meaning and the interpretation of the recording. So, for example, the second conversation that's to whether it relates to meth trafficking, and there's an objection, and the court immediately addresses it in terms of this is just to place this recording in context, and the interpretation of the recording and the interpretation of this meeting is entirely up to the jury, and it's the jury's determination as to the meaning of the recording. There's not a sufficient basis here, certainly on grounds argued by the defense in their briefs to find any significant Freeman error in this case. Mr. Craisman didn't get there, but he suggested that he was going to talk about the potential for error in the jury instruction with regard to the elements of murder under Michigan law. There was one murder and a couple of assaults with intent to murder that were charged as racketeering acts under Michigan law, and the government gave the one murder under Michigan law, but left out and omitted intentionally what is a so-called element in those pattern instructions of the absence of justification or mitigation for the alleged murder. And in my brief on this case, I indicated that there was no evidence to support justification or mitigation with regard to any of those alleged murders or assaults with intent to commit murder. There was no claim of justification in this case? There was no actual claim of justification. Now, actual, I mean, there was no assertion of justification? No assertion of justification. Okay, so it wasn't at issue then? It wasn't at issue until the reply brief that was filed by Mr. Daley, in which he now claims that there was evidence of justification, not an assertion of justification, but evidence of justification for his role in shooting Jeff Young. But in the actual record in this case, and in the request for instructions, the defendants made no factual argument for mitigation factors. Okay, so is it your argument it's not preserved? The issue is not preserved? To that particular issue raised only in Mr. Daley's reply brief, it's not preserved. That's my position. This court has expressed interest in the premises enhancement in talking to Mr. Robinson. I've addressed that pretty thoroughly in our brief. We do rely on the Holmes case, and we do rely on our interpretation of the 1B1.3 of the guidelines. In terms of 1B1.3 says, unless otherwise specified, a member of conspiracy can be found responsible for any other activity that's reasonably foreseeable and within the scope of the conspiracy. And certainly here, it was reasonably foreseeable, and within the scope of Mr. Castano's conspiracies, that there would be premises at which meth manufacturing would be taking place. In fact, he was present at some of those so he's certainly properly held responsible under general relevant conduct principles for maintaining the premises. But there's another issue that was raised or at least discussed in response to Judge Griffin's question, and that's the issue of the statutory maximum for count one, the RICO count at trial one. And I'd say this only applies to trial one because the RICO count in the third superseding indictment that was the basis for trial one did not specifically allege drug quantities over 500 grams of methamphetamine. In the fifth superseding indictment, that was the basis for trial two, that was a revised indictment tailored for trial two, there is that specific allegation. But the fact is, this issue was not raised below. It wasn't raised pretrial. It wasn't raised at trial. It wasn't raised at sentencing. Each of these defendants, when he was arraigned, signed an acknowledge of an indictment, that's a form that we use in the Eastern District of Michigan, in which he acknowledged knowing what he was charged with and knowing the potential penalties for the case that he was charged. And each of those acknowledgements included acknowledgement that he was exposed to a potential life sentence on both count one and count three, the methamphetamine conspiracy count, which did contain a specific allegation of the drug quantity. So if at most this is subject to an error analysis by the court, the defendants have notice of the potential life sentence, they acknowledge it. There's no apprending issue here, as the jury did make a necessary finding as to both count one and count three, that those counts involved the necessary drug quantities for a potential life sentence. Finally, I want to talk briefly about Mr. Robinson's argument regarding the use of the in 2009. Case in chief means what it says. I've laid out the authority in my brief for the proposition that case in chief means evidence presented at a criminal trial. It does not include evidence presented before the jury. But as Judge Griffin pointed out, the fact that there was a proper agreement by Victor Cassano rules anyway. That fact that was found by Judge Cleland establishes that there can be no proper objection to the use of the proper statement, either in the grand jury or at trial. That finding was not clearly erroneous. It had a clear foundation based upon omissions that Cassano made. He omitted information regarding the role of Van Diver in some of the events. He omitted information regarding the role of Michael master Mateo in these events. He omitted information about a 400 pound marijuana deal. He only talked about his small time dealing of pound quantities that he got from sources in Detroit and a 100 pound marijuana deal involving marijuana brought in from Texas. He did not talk about Cassano's role in bringing that marijuana from Texas. And he certainly did not talk at all about his involvement in meth deal. He didn't talk about the meth that he had sold to master Mateo. It wasn't insignificant quantities. It was a quarter pound and a half pound on two different occasions. And he didn't talk about the ounces of pure meth from his Mexican connection that he provided to Vern Rich for resale. So there were significant omissions from his profit. Now, Judge Griffin asked about, well, what about also the fact that his girlfriend had correspondence with him in which he acknowledged that he was concealing information? Mr. Robinson's response was this was before the fact. And that's true. It was before the fact. It was before his 2009 proffer. But he had started to attempt in his limited way to cooperate earlier. After his conviction on the narrow drug and gun charge back in 2006 in federal court, he had an earlier proffer. And that's the proffer he was talking about in those about how he had protected the ones he wanted to protect and given information against the ones that he had a grudge against, such as Vern Rich. And that certainly is relevant to the fact that he did the same thing. He tried again to cooperate in his limited way in September of 2009. So taking all that together, there's a clear foundation for finding that he breached the terms of his proffer agreement. There was no error in using that information, either in the grand jury or at trial. And by the way, the pretrial motion didn't even seek dismissal of indictment. The pretrial motion only sought suppression or elimination of evidence purportedly taken from the proffer, from the indictment, and from any trial. And all of that was resolved by Judge Cleland in addressing the government's motion in limine in trial two with regard to the use of McDonnell's proffer statement in trial two of this case. Does the court have any other questions for me as to these or any other issues that are presented in this case? I have none, Judge Sir Heinrich. Do you have any questions for Mr. Lake? No. All right. I thank the court for its attention. I thank you all for your attention. And I would submit that these convictions should be affirmed as well as the sentences based on those convictions. All right. We thank you for your argument and also your knowledge of the case, Mr. Lake. Remarkable how you could argue with very few notes. And obviously you know the case very well. All right. Let's, we've got rebuttal. Ms. Mazzaroni, you have two minutes rebuttal. Ms. Mazzaroni, your microphone is muted. Sorry about that. To the extent that I've convoluted or I've confused the two standards of probable cause and necessity with the Title III, I want to take a step back. Probable, both elements have to be shown in order to get a valid Title III wiretap. Probable cause, as this court knows, is the fair probability that contraband or evidence of a crime will be found in a particular case. The necessity requirement goes to the investigative tools used to investigate the case. And my argument in this case is simply with the number of cooperating witnesses, the number of confidential informants, the number of people who were assisting the government at every single step of this investigation. Beginning in 2002, there was simply no necessity for the wiretap on Paul Dara's phone. John Pizzutti was doing hand-to-hand buys. What's a much better, what's a better indication that individuals in this organization were dealing in drugs other than hand-to-hand buys at the direction of the FBI? He was wearing wiretaps into the church meetings. They could have heard anything and everything that was going on in the church meetings. There was another cooperating witness who was also doing hand-to-hand buys. There simply was no need for this extremely investigative tool. They were getting the investigation going. Whatever they were finding, they were investigating this case normally with the regular and normal investigative techniques. Finally, on the sentencing hearing, I just want to bring up as what Mr. Morgan talked about with relevant conduct. The judge made a determination in order that you were responsible for everything that occurred the day that you became a patched member, unless you were Paul Dara and they held him responsible for two murders that occurred in 1994 before he became a patched member. I just wanted to add that to my argument that sentencing in this case, re-sentencing in this case, is warranted and re-sentencing in front of a different judge is definitely warranted. All right. Thank you. Any further questions? All right. Next counsel, please. Thank you. In response to what the prosecutor has indicated, he basically says that the judge could have denied substitute counsel. We don't know that. That's not what he said. We can't really address this issue based on speculation. The bottom line is our Supreme Court in Gonzalez-Lopez has indicated that a defendant has the right to counsel of choice under the Sixth Amendment. They further held that in reviewing such a right as to whether it was denied, the defendant need not demonstrate actual attorney was defective and he need not that he was prejudiced by any supposed deficient performance. Essentially, what the court has held is that when denial of counsel of choice occurs, everything after the fact is totally irrelevant. It's our position that when Judge Cleland entered the order stating specifically that court appointed counsel would basically do the direction of the defense and retain counsel, both myself and Mr. Pitts were not to otherwise interfere or impede with her direction of the defense and that she may allow us to assist in trial preparation shows clearly, I think clearly, that we were not counsel of choice. We were not allowed to be lead counsel, which is the whole reason that... One of you was allowed to cross-examine witnesses, make a closing argument. That's a participation in the trial. That's a participation in the trial, but that's not specifically directing the defense of this case. And again, I would argue that had Judge Cleland indicated that retained counsel would direct the defense and that court appointed counsel could assist at retained counsel's have an issue here. But the fact of the matter is what ended up happening is Judge Cleland decided who the better counsel was in this case, rather than Mr. Whitworth. And that's what the violation is. All right. Any further questions, Judge SirHeinrich, Judge Donald? All right. Mr. Daly. Thank you, Judge. I want to start with the jury instruction on the RICO conspiracy because both Judge Griffin and Mr. Light asserted that there was no law that supported the Tuckle decision. I would draw your attention to the pattern or model jury instructions in the 8th and the 11th circuit, both of which support our position. And I would draw your attention to the decisions specifically set forth in our brief on the 1st, 2nd, 4th, 7th, and 10th circuits that all support our position about what are the elements of a RICO conspiracy under subsection D. With regards to the elements, you know, the government says that Salinas addresses this mere dicta, but I would suggest that you look at Salinas because Salinas does not answer the question before the court or resolve the issue at all. The issue in Salinas was whether or not an individual defendant had to himself agree to two or more predicate RICO acts. And the answer to that was no. That's the only thing that Salinas stands for and nothing more. So with regards to the existence of the enterprise that both Judge Griffin and Judge Donald addressed, I would caution not to think that because certain defendants pled guilty that that's any evidence whatsoever that there is the existence of a RICO conspiracy in this case. And the jury was told that. They could not consider guilty pleas in themselves. And we know that as evidence of the existence as Judge Griffin had asked. Judge Donald asked the question about the existence of the enterprise and Mr. Light correctly said that in order for it to be an enterprise under the RICO statute, there has to be a common purpose to violate the substantive provisions. So the existence of the DDMC in itself or membership in the DDMC is not illegal. And in fact, the government agreed to that and the jury was so instructed. The existence of the DDMC is no different than the Catholic Church or the Lions Club for that matter. Well, I don't think you want to compare the devil's disciples to the Catholic Church. I'm not. What I am is the definition of what constitutes an enterprise and whether or not it's sufficient under the law to merely say that the motorcycle club existed. That's the point that I'm making. With regards to the waiver on the jury instruction on the Michigan law, I'm not really sure what more we need to do. We made a specific request to the court to instruct on the elements, which included the fact that there were in the record evidence of defense, provocation, and the record supports that. So to say that we waived that is, I don't think, correct. And when you go back to the record, just look at what Jeffrey or Jethro Young said. So Jeffrey Young, Jethro, said that he was in his vehicle and he saw Mr. Smith. And Mr. So what did he do? He took a dangerous weapon and he got out of his car and he approached Jeff Smith and smacked his window. And what did he do after that? He jumped in his car and he went back to his house. And what was in his house? An arsenal of weapons that included a machine gun and a bomb. So that when Mr. Smith, my defendant, showed up at Jethro's house, the first thing that Jethro did, he ran out of his house with a baseball bat and attacked Mr. Smith in his vehicle. And as he was running back, he was shot in the bottom of his, I think it was his right calf. And what did he do? He got a shotgun and he shot up the van that Mr. Smith in. Has all of the elements of provocation and self-defense. Okay. All right. We'll take a careful look at the record on that. Any further questions at this time, Judge Sir Heinrich, Judge Donald? Okay. Next counsel. Your honors, thank you. I think it's interesting that Mr. talks about the first example that I cited during my oral presentation was prior to any objection on the fifth day of testimony. I would highlight that as being significant, but for a different reason. It was because that was before the government and the defense briefed the issue, argued it to the court and attempted to get agent Fleming to somewhat tailor his defense. Importantly, however, is when the government talks about the second instance that has been briefed. And again, these instances are prevalent throughout the case. Let's talk about what the judge said to the jury in its ruling. The judge to the jury said after it was objected to by two different lawyers by the defendants, the assertion is that it's related. In any event, it's the impression of the witness. It's not a facts assertion. It is, it's a view gathered from the interviews and from elicited testimony and gathering of evidence that much has been made clear. Your honors, that smacks directly against United States people cited in Kilpatrick, cited by the parties that in order to have personal knowledge that the declarant has to be a participant in the conversation, has to have personal knowledge of the facts in that conversation or observe the conversation as it occurred. The problem is, is they don't meet that threshold and they certainly don't make the other two. Unlike Kilpatrick, this testimony was not helpful to the jury under 701, the second requirement. And unlike Kilpatrick, it was this, it was clearly disguised as 702 expert testimony, which, which therefore ignore, uh, which diverted or got past the notice requirement, the discovery requirements, and the need to have passed the Dalbert and Comer. Thank you for the questions. Thank you for your argument, Mr. Krantzman. Yes. Uh, Mr. Light, um, has an extraordinary task that he's being called on. Um, and, um, I appreciate that. Uh, he's, I have to face, uh, eight or nine different attorneys. Um, he mentioned the, the fact that, uh, McCune Magoo, uh, that the, uh, the, um, uh, the false memory of the district judge that McCune always had an eight ball, an eighth of an ounce with him. And he mentioned in response, Jeff Arnold in Alabama, and that there was a sale, but in fact, the testimony, and this is actually quoted in my reply brief at page 22, Jeff Arnold testified that they quote, just party quote unquote with the methamphetamine. And that's, uh, I cite that that's our one Oh seven five it's page six, five, two, four. So Mr. Light is incorrect in his memory in his response. Uh, and we are, we are requesting that the court reverse the conviction, uh, based on the constructive amendment, uh, and also what the reverse with respect to the sentencing and have sentencing before another judge. If there's any questions, I'm going to answer them. Uh, apparently not. Thank you, Mr. Davis or Ms. Davis. I'm sorry, Ms. Davis. That's fine. Your honor, the government once again, does not address or even acknowledge Mr. Drozdowski's procedural reasonableness argument about the district court, basing his sentence on the assault case on clearly erroneous facts. And as though the impact of the court's adherence to those clearly erroneous facts on the rest of Mr. Drozdowski sentence, um, given that the government didn't address anything about Mr. Drozdowski, if the court doesn't have any questions, Can you see him now? Thank you very much for your argument. Uh, Mr. Morgan. Sorry, I couldn't find him. Uh, the court please, uh, four major drug traffickers, uh, Stacey, Don Reedy, Master Mateo, and Vern Rich, no relation to Michael Rich. I never implicated Michael Rich in any kind of drug trafficking, uh, not a word. Armstrong was referred to by, uh, Mr. Light. Armstrong is the witness who, uh, had some contact with Michael Rich in the brief period of a year, year and a half that Rich was in the Fort Huron area before going to Alabama. Armstrong was the witness who testified out of what he called himself, uh, the fog of, uh, memory and addiction. Uh, and Armstrong testimony, testimony, uh, showed the transition from his initial contact with the government, no mention of Michael Rich to, uh, mention that he used, uh, methamphetamine with Rich. So the day before he testified, when all of a sudden, now he has made a couple of eight ball sales, which is, uh, Mr. Christman noted personal use amount, uh, to Michael Rich, uh, judge Donald asked the question about wasn't not paraphrasing a lot of this. These crimes were individually animated for individual purposes and were secretive. Ronald Roberts testimony indicates that very well stolen motorcycles were in Alabama. Was it part of the club? No, I did it for my own self, for my own purpose. Don't drag the club into that. Uh, there's, uh, the term leader, leader, leader has been thrown around a lot without attribution and various fleeting. And I know the court probably doesn't favor me reading from the transcript now, but I found this, uh, in the last few minutes. And this is from the government's closing argument. And it begins at that page ID two five eight zero eight. And the prosecutor says there was, there was some other individuals that were leaders, but you've also heard some talk about tattoos. That's Michael Rich. I don't know what his title was or wasn't. I'm not sure that you heard any evidence about that. And then she makes mention of the fact that he was treasurer at one point. Uh, he was not a leader. He was a mere member, not withstanding the long period of time. And he's not responsible for the array of, of acts that others perpetrated without his knowledge, without his involvement and with no reasonable foreseeability. Uh, and that includes post indictment conduct. Michael Rich is on bond in Alabama and he's held responsible for alleged threats in jail. Uh, to be sure Michael Rich was convicted of obstruction of witness dampening. Those guidelines are 87 to 108 months. Thank you. Thank you, Mr. Morgan. Any further questions? Judge sir. Honor it. Judge Mr. Robinson. Yes, your Honor. Uh, real quickly, uh, two things with respect to the sentencing claim and the enhancement for maintaining a drug premises. Um, the reason it shouldn't apply it's because Castano didn't personally maintain the premises and that's what the guideline says on its face. Uh, the reason, uh, the Holmes case is wrong is well, it it's reasoning is in conflict with six circuits decision in USA versus Butler 207 fed third eight 39, which refused to find a strict liability with respect to a similar enhancement. And in that case, they pointed out it was proper for the district court to take a plain language approach. And I'm, I'm paraphrasing now rather than relevant conduct approach and its interpretation of the enhancement because the courts must treat the sentencing guidelines as if the stats as if they were statute and follow the clear unambiguous language. Um, so, you know, and that's in Butler reciting Lewis. And then when you look at the recent habits decision, which also seems to, uh, turn up the volume on the importance of the language of the guidelines itself rather than the commentary or anything else, uh, you need to look at that. And then finally, I look at the, the list of guidelines enhancements, and there's a difference between, uh, enhancements that start out with, if the defendant did something versus if the offense involved and those guideline enhancements, each, each enhancement is, is applied differently. And, uh, based upon, um, you know, those premises, and Mr. Cassano certainly did not. And we would argue even in relevant conduct standards, he, he shouldn't be held liable for that enhancement. And with respect to the Fifth Amendment argument that we're making, uh, what the government has argued today is not what it argued to the court below. And that's important because that's the reason the court found that Cassano had breached the agreement. Um, you know, the government admits that the letters were now written after or before, uh, any of this, the proffer session. And now they're saying it's only relevant. Uh, the court, it was argued at the, in the trial that those letters were evidence that Cassano had breached that proffer agreement in that proffer session. And the Rule 32, uh, the, uh, Rule 302s, the FDI 302s are on the record. So with that, I would ask that Mr. Cassano's conviction be vacated. And if not, that his sentence be vacated and remanded to a new sentencing judge. Any further questions, Judge Sir Heinrich, Judge Donald? All right. The court wishes to thank all counsel for their helpful arguments today. We also note that, uh, defense counsel, except for, uh, defendant Robinson had been appointed pursuant to the criminal justice act. Uh, we appreciate your service to the court and thank you for your representation in this case. Uh, having no other cases on the docket this morning, the case will be submitted and, uh, you may adjourn the court. Yes, Your Honor. This trial of the court is now adjourned.